Joseph Nathan and F. William Spiegel, Jr., Plaintiffs-Appellees, v. Herbert R. Leopold, Defendant-Appellant.

Gen. No. 50,924.

First District.

April 7, 1969.

James P. Chapman, of Chicago, for appellant.

Edward I. Rothschild and Donald E. Egan, of Chicago (Rothschild, Hart, Stevens & Barry, of counsel), for appellees.

MORAN, J.

Defendant, Herbert R. Leopold, appeals from a summary judgment entered in favor of plaintiffs, Joseph Nathan and F. William Spiegel, Jr., for $154,000 and costs in the Circuit Court of Cook County.

Plaintiffs brought this action to recover for money expended because of Leopold's refusal to indemnify them for their purchase of stock from Michael Wolfson and Harry Zaidler, pursuant to contracts that Wolfson and Zaidler, the plaintiffs and the defendant had entered into. Plaintiffs filed a motion for summary judgment and on March 17, 1965, the trial judge found that "from the

pleadings, admissions, exhibits, and depositions that no genuine issue of facts exists," and entered judgment against the defendant in the sum of $154,000 and costs against the defendant Leopold. We affirm.

During the period relevant to this controversy, Leopold was president of Argus and a member of its board of directors. Wolfson and Zaidler were the principal officers of Fairbanks-Ward Industries, Inc., a wholly-owned subsidiary of Argus. Nathan and Spiegel were the owners of Alldec Corporation.

Argus wanted to sell and Alldec wanted to buy Fairbanks-Ward from Argus. However, as a condition of buying Fairbanks-Ward, Alldec deemed it necessary that Wolfson and Zaidler remain with Fairbanks-Ward after Alldec had purchased it. On the other hand, Wolfson and Zaidler owned stock in Argus and were unwilling to extend their employment contracts with Fairbanks-Ward unless they could dispose of their stock in Argus for a fixed price. As a result of this rather complicated situation, two contracts were entered into, which in pertinent part read:

## "AGREEMENT A.

### "MEMORANDUM OF AGREEMENT

"AGREEMENT entered into this 27th day of December, 1962, between MICHAEL S. WOLFSON AND HARRY ZAIDLER (hereinafter sometimes collectively referred to as 'W–Z'), JOSEPH NATHAN AND F. WILLIAM SPIEGEL, JR., (hereinafter sometimes collectively referred to as 'N–S'), and HERBERT R. LEOPOLD (hereafter sometimes referred to as 'Leopold'),

163

"WITNESSETH:

"WHEREAS, W–Z are the owners of 14,000 shares of common stock of ARGUS INCORPORATED ('Argus') and desire to sell the same, upon the terms hereafter set forth; and

"WHEREAS, N–S are willing to purchase said shares at the price and upon the terms hereafter set forth; and

"WHEREAS, Leopold is willing to guarantee unto W–Z the performance of the undertakings of N–S,

"NOW THEREFORE, it has been agreed between the parties as follows:

"1. W–Z, jointly and severally, agree to sell to N–S, and N–S, jointly and severally, agree to purchase fourteen thousand (14,000) shares of common stock of Argus owned by W–Z, less that number of shares which may otherwise be sold by W–Z, as hereafter provided, on the following basis:

"(a) One-half ($\frac{1}{2}$) of such shares which have not otherwise been sold by W–Z shall be delivered and paid for not later than December 31, 1963.

"(b) The remainder of such shares which have not been theretofore sold as herein provided shall be delivered and paid for not later than December 31, 1964.

"(c) The price for each share purchased by N–S shall be Fifteen Dollars ($15.00) per share.

"(d) None of such shares shall be purchased prior to January 5, 1963.

"2. W–Z shall, on or before January 5, 1963, deliver certificates aggregating 14,000 shares of such stock to Freehling, Meyerhoff & Co. of Chicago, Illinois, with duly executed stock powers so

that such shares may be transferrable upon delivery. All federal stock transfer taxes payable in connection with such shares shall be paid by W–Z. All brokerage commissions and expenses related to the sale of such shares for the account of W–Z to persons other than N–S and Leopold shall be borne by W–Z. From time-to-time W–Z may cause such shares, or any part thereof, to be deposited with a Registered broker other than Freehling, Meyerhoff & Co., provided that such broker maintains an office in Chicago, Illinois. At any time prior to December 31, 1964, W–Z may sell all or any portion of such shares in open market, at the then current market price thereof; provided, however, that no such sale shall be effected at a price in excess of $15.125 per share. All proceeds realized from such sales shall be paid over to W–Z, with no claim against N–S or Leopold for any difference between the proceeds and $15.00 per share.

"3. At any time subsequent to January 5, 1963 and prior to December 31, 1964, N–S or Leopold shall have the privilege of purchasing any part of the unsold portion of such shares, subject to the provisions of the preceding paragraphs, by paying $15.00 for each such share purchased and depositing the amount of such purchase price within five (5) days following such election.

"4. Leopold hereby unconditionally guarantees unto W–Z the purchase of and payment for such shares by N–S on or before December 31, 1963 and December 31, 1964, respectively, as above set forth. If payment for such shares shall not have been made by N–S within 5 days from such dates, then upon notice to Leopold he shall pay for the same, in which event Leopold shall be entitled to acquire such shares for his own account. If N–S shall purchase and pay for such shares, then within five (5)

165

days thereafter Leopold shall have the right to purchase the same from N–S at the price paid by N–S. In no event shall W–Z have any responsibility with regard to the option of Leopold to repurchase shares from N–S.

" . . ."

"AGREEMENT B

December 27, 1962

Messrs. Joseph Nathan and
F. William Spiegel, Jr.
Chicago, Illinois

GENTLEMEN:

This will confirm our agreement relating to the contract of even date with Messrs. Michael S. Wolfson and Harry Zaidler pertaining to the purchase of their 14,000 shares of common stock of Argus Incorporated.

1. I hereby unconditionally indemnify each of you against any and all liability whatsoever to Messrs. Wolfson and/or Zaidler under such agreement; and

2. You hereby assign to me all of your right, title and interest in and to said contract and the 14,000 shares of Argus stock described therein, upon condition that: (a) I shall discharge in full all obligations relating to the purchase of such shares, and (b) I shall be entitled to make such purchase in my name or in the name of anyone I may designate, and in such case you shall not be entitled to any of such shares or any interest therein.

If the foregoing meets with your approval, please sign the duplicate where indicated.

Very truly yours,

/s/ Herbert R. Leopold
Herbert R. Leopold

166

Accepted and Agreed to:

/s/ Joseph Nathan
Joseph Nathan

/s/ F. William Spiegel, Jr.
F. William Spiegel, Jr."

On December 24, 1963, after Wolfson and Zaidler called upon Nathan-Spiegel to purchase the first installment of their unsold stock pursuant to Agreement A, Nathan-Spiegel made demand upon Leopold to purchase the 7,000 shares of Argus on or before December 31, 1963 for $15 per share. Leopold refused to purchase said shares. On January 13, 1964, Nathan-Spiegel purchased the 7,000 shares from Wolfson and Zaidler pursuant to Agreement A. On January 28, 1964, Nathan-Spiegel filed this suit against Leopold.

In December, 1964, Leopold refused to purchase the remaining 7,000 shares. Thereupon Nathan-Spiegel also purchased these shares from Wolfson and Zaidler for $15 per share and amended their complaint accordingly to a claim for $154,000, the difference between the market value of $4 per share existing at each purchase and the actual price of $15 per share paid.

Leopold admits that Nathan-Spiegel made demand upon him to purchase the Argus Stock and that after his refusal, they purchased the shares.

Defendant contends that his promise of indemnity in Agreement B was not supported by consideration, because Nathan-Spiegel only repeat their promise to assign the Argus stock to him, which promise was already contained in Agreement A. This contention is without merit.

■■ Agreement B by its very terms assigns to Leopold all the interest which Nathan-Spiegel possessed under Agreement A in consideration for his promise of indemnity. Agreement B thus clearly enlarged the op-

167

tion which Leopold had attained by his execution of Agreement A. The option created under Agreement A was good for only five days. Under Agreement B, Leopold was completely entitled to the stock. This admittedly did not give Leopold much more than he already had, but the issue is not to determine the adequacy of the consideration, but rather to find its existence. The inadequacy is for the parties to consider at the time of making the agreement, and not for the court when it is sought to be enforced. 17 CJS, Contracts, § 127, p 843.

The stated consideration in Agreement B is sufficient to uphold its validity. As a result, the contract clearly establishes the liability of Leopold to purchase the Argus stock.

Leopold also contends that Nathan-Spiegel's promise in Agreement A to purchase Wolfson and Zaidler's Argus stock was without consideration and therefore not a liability covered by his contract of indemnity. This argument is based on the premise that Wolfson and Zaidler had an unlimited right to decide the nature and extent of their performance thus making their promise contained in Agreement A purely illusory.

While it is true that Wolfson and Zaidler, prior to December 31, 1964, could sell their stock to anyone, it must be remembered that this privilege was conditioned upon and thus limited by their inability to sell it for more than $15.125 per share. Also, Nathan-Spiegel had the continuing right after January 5, 1963, the date when the stock was to be delivered to the stock broker, to purchase all 14,000 shares for $15 per share thereby preventing Wolfson and Zaidler from selling to someone else. If Nathan-Spiegel or Leopold demanded the shares and tendered the agreed amount per share, they could not be refused delivery.

The contract in this case is not analogous to those cases where contracts have been held void for lack of mutuality upon a finding that there was no considera-

168

tion for the promise of one party to sell as much of the commodity as the other may want, except the promise of the other to take and pay for as much as he wants, there being no agreement that he shall want any quantity whatever, nor any means of determining what quantity, if any, he shall want. Such cases are examples of where one party to a contract had an unlimited power to determine his obligation without incurring a detriment to obtain that power. The contract in the instant case does not provide such a situation. In Agreement A Nathan-Spiegel have promised to purchase from Wolfson and Zaidler at $15 per share in two equal installments what remains of their 14,000 shares of Argus stock. In return for this promise, Wolfson and Zaidler promised to sell to Nathan-Spiegel upon the agreed terms and to forbear selling any of the 14,000 shares elsewhere for more than $15.125 per share. Wolfson and Zaidler's promise was therefore not unlimited but rather was expressly limited by the maximum price at which they could sell their stock.

It is recognized that where there is no other consideration for a contract, the mutual promises of the parties constitute the consideration as long as they are binding upon the parties. Armstrong Paint and Varnish Works v. Continental Can Co., 301 Ill 102, 133 NE 711. The court in W. P. Iverson & Co., Inc. v. Dunham Mfg. Co., 18 Ill App2d 404, 413, 152 NE2d 615, quoted with approval Professor Williston: "Sufficient consideration in a bilateral contract may be defined as: Mutual promises in each of which the promisor undertakes some act or forbearance that will be, or apparently may be, detrimental to the promisor or beneficial to the promisee, and neither of which is void, are sufficient consideration for one another." It is not necessary to the mutuality of a bilateral contract that the promises must be exactly of the same kind and nature. Aldrich v. Aldrich, 260 Ill App 333. Wolfson and Zaidler's promise

contained in Agreement A was a detriment to them and as such constituted good consideration. Thus, since there was good consideration supporting Agreement A, this was an enforceable contract creating liabilities on each of the parties. Therefore, Nathan-Spiegel were liable to Wolfson and Zaidler on this contract and as a result, Leopold's promise of indemnity contained in Agreement B must be enforced.

 Since the contracts involved in this case are clear and unambiguous, we have decided the rights and obligations of the parties thereto solely from the terms of the contracts which they signed and without regard to any parol evidence, for in such cases the instrument itself affords the only criterion of the intention of the parties. Cimino v. Cimino, 93 Ill App2d 412, 236 NE2d 299.

Leopold further contends that it was a question of fact whether he was induced to sign Agreement B without reading it as a result of the incorrect representation by Kasakoff, an attorney for Argus and Wolfson-Zaidler, as to its contents.

Since Leopold expected to be out of the city on the date set for the closing, December 27, 1962, Kasakoff took the agreements with him to Argus shortly before Christmas for Leopold's signature. Leopold was busily engaged in making and receiving numerous telephone calls when Kasakoff entered his office. Kasakoff laid the agreements on Leopold's desk and Leopold riffled through them, asking Kasakoff what they contained. Kasakoff replied that they contained his guaranty to Wolfson and Zaidler of the obligations of Nathan-Spiegel to purchase the Argus stock. Leopold specifically asked why he was required to sign the one-page letter agreement (Agreement B) from him to Nathan-Spiegel. Kasakoff stated in his discovery deposition that he answered that this covered "the arrangement between you and Spiegel and Nathan that Baskes spelled out to me, which

has nothing to do with Wolfson and Zaidler and which will be a counterpart as between you and them." In his affidavit, Leopold stated that Kasakoff only told him that it was a counterpart to Agreement A which insured that he would be entitled to those Argus shares which he might be forced to buy pursuant to Agreement A. Leopold was not represented by an attorney at the execution of these agreements or at any stage of the negotiations.

██ ██ Whether Leopold was induced by Kasakoff's representations or not, the law is that a party who signs an instrument relying upon representations as to its contents when he has an opportunity to ascertain the truth by reading and does not avail himself of the opportunity, cannot be heard to say that he was deceived by misrepresentations. Flannery v. Flannery, 320 Ill App 421, 51 NE2d 349. Leopold had ample opportunity to read Agreement A and as his brief argues, Kasakoff was not his attorney, thus dispelling any notion that he might have been justified in relying on Kasakoff's representations. Leopold's original intentions, if otherwise, were thus frustrated by his own negligence and not through any misrepresentations.

 Our view of summary judgment proceedings was thoroughly researched and stated in Harp v. Gulf, M. & O. R. Co., 66 Ill App2d 33, 38, 213 NE2d 632:

> "The purpose of summary judgment proceedings is to determine whether there is any genuine triable issue of fact which must be passed upon. Gribben v. Interstate Motor Freight System Co., 18 Ill App 2d 96, 151 NE2d 443. If the pleadings, discovery depositions and exhibits, present a genuine issue as to any material fact, summary judgment should not be granted. Halloran v. Belt Ry. Co. of Chicago, 25 Ill App2d 114, 166 NE2d 98. The right of the moving party to summary judgment must be free from doubt. Miller v. Owens-Illinois Glass Co., 48

171

Ill App2d 412, 199 NE2d 300. The affidavits filed in support of a motion for summary judgment will be strictly construed and must leave no question of the movant's right to judgment, but the affidavits filed in opposition thereto will be liberally construed. Tansey v. Robinson, 24 Ill App2d 227, 164 NE2d 272."

With this understanding and with a recognition that summary judgment is an extreme remedy, we have carefully studied the pleadings, affidavits and depositions in the record in an effort to find a genuine issue of fact. Our search has failed to disclose any such question of fact which would give rise to the right to a trial.

For the foregoing reasons, the summary judgment of the Circuit Court of Cook County is affirmed.

Judgment affirmed.

EBERSPACHER and GOLDENHERSH, JJ., concur.